HOPE BASKET CO. et al. v. PRODUCT ADVANCEMENT CORPORATION et al.

No. 1104.

United States District Court W. D. Michigan, S. D.

Feb. 17, 1950.

As Corrected June 2, 1950.

Herbert H. Porter, Washington, D. C., Edwin T. Bean, Buffalo, N. Y., Harold W. Bryant, Grand Rapids, Mich., for plaintiffs.

Spencer, Marzall, Johnston & Cook, John A. Marzall and Lloyd C. Root, Chicago, Ill., Frank E. Liverance, Jr., Grand Rapids, Mich., for defendants.

STARR, District Judge.

This suit involves principally questions as to the rights of the parties under five royalty license agreements dated April 1, 1930, and as to the validity of Schmidtke basket patent No. 1,895,586 issued January 31, 1933.

The material facts necessary for a determination of the decisive issues in the case are not in dispute. The plaintiff Hope Basket Company, an Arkansas corporation, is engaged in the manufacture of baskets at Hope, Arkansas. The plaintiff Walter Verhalen Company, a partnership, of Dallas, Texas, successor to a former partnership of the same name, is the principal stockholder of the Hope Company and is its sales agent. The defendant Product Advancement Corporation of Benton Harbor, Michigan, is successor by change of name to the Straight Side Basket Corporation, and both are herein referred to as "Advancement Corporation." This company is engaged in licensing the manufacture of baskets under certain patents, including those hereinafter mentioned. Defendant St. Joe Machines,

Inc., of St. Joseph, Michigan, is successor by change of name to the St. Joe Iron Works, and both are herein referred to as "St. Joe Machines." It manufactures machinery and machine attachments for making baskets.

On March 25, 1926, Albert H. Schmidtke, an employee of St. Joe Machines, filed original patent application entitled "Basket and Method and Apparatus for Making Same." The patent office required a division of the application between the basket claims and the method-and-apparatus claims, and a divisional application on the basket claims was filed and was copending with said original patent application. After the conclusion of interference proceedings as to each application, method-and-apparatus patent No. 1,752,856 was issued April 1, 1930, and basket patent No. 1,895,586 was issued January 31, 1933. The method-and-apparatus patent is herein referred to as the "machine" patent, and the patent relating to basket construction is referred to as the "basket" patent. The patent applications had been assigned to St. Joe Machines, which became the owner of both patents. While the applications were pending, St. Joe Machines granted exclusive licensing rights under the applications, and patents when issued, to defendant Advancement Corporation.

Following the issuance of the machine patent, Advancement Corporation called a meeting of basket manufacturers to be held in Cincinnati, Ohio, on April 10, 1930, for the purpose of licensing such manufacturers to use certain machine attachments and to manufacture straight-side, broken- and bent-bottom baskets. The meeting was attended by representatives of Advancement Corporation and by a number of basket manufacturers, including plaintiff Walter Verhalen. Prior to the meeting Advancement Corporation had printed a proposed form of "attachment license" to be submitted to the basket manufacturers, and during the meeting there were discussions and negotiations regarding amending and changing this form of license so that it would include patents relating to baskets, thereafter issued, on which Advancement held licensing rights. The president of Advancement testified regarding this dis-

cussion at the Cincinnati meeting as follows:

"Paragraph (section) 15 was first criticized by prospective licensees on the ground that it was somewhat unilateral. It did not include the basket patent in its terms, and it gave no rights to the basket patent as such, and we agreed * * * that for their protection and for our own protection, to more clearly include the basket patent which was to issue, as well as the machine patent, (the first) paragraph (of section) 15 was cancelled and paragraph (section) 25 was substituted therefor.

"When we printed the contract we did not feel that it was necessary to put the basket patent application in there, because we considered it part of the machine application, and we told the people down there that this basket patent was to issue. Now, as to whether or not I personally told Mr. Verhalen individually about the basket patent, I cannot say; it is too many years ago for me to definitely say, but I do know that the meeting was very informal, we would talk to individuals and the prospective licensees would talk with one another, so I do know that the knowledge of the pending basket patent was wide-spread throughout that meeting."

The general manager of Advancement Corporation testified relative to the discussion and the amendment of the first paragraph of section 15 of the proposed form of license as follows: "When we went to Cincinnati, * * * we had our printed form of contract, * * * Mr. Sturdivant (attorney) was there, representing some of the eastern (basket) manufacturers, and he approved, I would say, 95% of the contract as presented. But he was in doubt about that paragraph (section) 15, whether it adequately protected these patent licensees upon the issuance of the basket patent, which we told everyone about, and which was then in application, and then, after he having brought up that point that it was perhaps not adequately covered, we commenced to wonder whether we had the validity phase of it properly covered; so, as a result we sat down with Mr. Sturdivant and his associates, and worked out paragraph 25, which would protect the li-

censees when the basket patent was issued —he would have full protection, and there would be no question but what the licensee would admit the validity of any newly issued patent."

The testimony of these witnesses, which was undisputed and was corroborated by that of the secretary-treasurer of Advancement Corporation, clearly establishes that at the Cincinnati meeting Advancement Corporation and the basket manufacturers agreed upon certain changes and amendments to the proposed printed form of attachment license; that is, they agreed that the first paragraph of section 15 should be cancelled and new section 25 substituted therefor, and that new sections numbered 26, 27, and 28 should be added. Some manufacturers executed the amended attachment licenses there in Cincinnati, and others executed them later.

As of April 1, 1930 (date of issuance of machine patent), defendant Advancement Corporation and plaintiffs entered into five separate "attachment license" agreements, each being identified by the number of the machine attachment therein referred to, that is, 140, 141, 142, 160, and 161. These five licenses were substantially identical and contained the amendments agreed upon at the Cincinnati meeting. A copy of No. 140 is set forth in appendix A following this opinion. The parties continued their operations under these five licenses until about 1940, when question arose as to what basket plaintiffs were obligated to pay royalties on. The matter was adjusted by the parties' executing a supplemental agreement, a copy of which is set forth in appendix B. This agreement was not dated, but the parties stipulated on the record that it was executed in 1940. Plaintiffs continued to manufacture baskets under the five attachment licenses and the supplemental agreement, using the machine attachments therein referred to, or replacements thereof, and paid the specified royalties to Advancement Corporation until the machine patent expired on April 1, 1947, and for several months thereafter.

Many other manufacturers of baskets had executed similar attachment licenses with defendant Advancement Corporation

and were using the machine attachments therein referred to and paying royalties to defendant. Beginning in 1946 plaintiff Walter Verhalen and others promoted a movement among these basket manufacturers to contest defendants' right to collect royalties under the attachment licenses after the machine patent expired on April 1, 1947. As a result of these activities several manufacturers contributed to a fund to be used in the employment of counsel and for the expense of prosecuting the present suit against defendants. On January 8, 1948, plaintiffs wrote Advancement Corporation as follows:

"We have held certain attachment licenses dated April 1, 1930, and executed by Straight Side Basket Corporation, your predecessor.

"Under paragraph 18 thereof, these licenses terminated as of April 1, 1947, the same being the date of expiration of the Schmidtke machine and method patent No. 1,752,856; and we hereby confirm the termination of said licenses as of that date.

"The attachments referred to in the said licenses are crated ready for delivery to you at Benton Harbor, or to such other place as you direct us. You have not informed us, since the said date of termination, where such attachments are to be shipped: and we await your early instruction concerning the same.

"Although said attachment licenses terminated April 1, 1947, you are continuing to claim from us moneys allegedly due as royalty under the said licenses, your claim being based on the Schmidtke basket patent No. 1,895,586.

"We hereby specifically deny any liability in such connection and refuse to make such payments, now or hereafter: for the reasons that no basket we have made or sold since April 1, 1947 is covered by or is an infringement upon said basket patent; that said basket patent is not set out in license agreement; that said basket patent is inoperative against us because we have already paid royalties under the machine and method patent for seventeen years; and that said basket patent is void.

"We have, in the past and since the expiration of said attachment licenses, because of your unfounded claims under the said basket patent, made payments to you in error and under duress; and we hereby demand immediate refund to us of all moneys paid to you relative to our manufacture or sale of continuous stave baskets since April 1, 1947, to wit:

| "1947 | |
|---|---|
| "For April | $356.52 |
| "For May | 431.05 |
| "For June | 573.48 |
| "For July | 765.80 |
| "For August | 673.64 |
| "Total paid | $2,800.49 * * * |

"Hope Basket Company * * * by Walter Verhalen, President.

"Walter Verhalen Company by Walter Verhalen, Partner."

On January 10, 1948, two days after the date of the foregoing letter, plaintiffs filed complaint in the present case in which they asked for a declaratory judgment determining: (1) That their five attachment licenses dated April 1, 1930, terminated upon the expiration of the machine patent on April 1, 1947; (2) that they were not obligated to pay royalties after the expiration of the machine patent; (3) that the basket patent was not within the terms and scope of the attachment licenses and, therefore, that the licenses did not continue in force during the life of that patent; (4) that the basket patent was invalid; (5) that they recover the royalties in the amount of $2,800.49 which they paid to Advancement Corporation after the expiration of the machine patent; (6) that the baskets they manufactured after April 1, 1947, were not within the claims of the basket patent; and (7) that they recover costs of suit and reasonable attorneys' fees.

In their answer and counterclaim defendants denied plaintiffs' right to the relief sought, and alleged that the basket patent was valid and that plaintiffs as licensees thereunder were estopped to deny or contest its validity; that the basket patent was within the terms and scope of the five attachment licenses; that the licenses did not

terminate on April 1, 1947, but continued in force during the life of the basket patent, which would expire January 31, 1950; that under the attachment licenses plaintiffs were obligated to pay royalties during the life of the basket patent; and that the baskets manufactured and sold by plaintiffs after April 1, 1947, were within the claims of the basket patent. In their counterclaim defendants further alleged in substance that plaintiffs had wrongfully induced and coerced, and were continuing to induce and coerce, other basket manufacturers who had executed attachment licenses with defendant Advancement Corporation, to breach their licenses and refrain from paying royalties. Defendants asked: (1) For a permanent injunction enjoining and restraining plaintiffs from interfering with defendants' business and from inducing and coercing defendants' licensees to breach their license agreements; (2) for a determination of defendants' damages sustained as a result of plaintiffs' alleged wrongful acts and doings, and that such damages be trebled; (3) that the five attachment licenses be declared valid and in full force and effect until the expiration of the basket patent on January 31, 1950; (4) that the basket patent be declared valid; (5) that baskets manufactured and sold by plaintiffs after the expiration of the machine patent on April 1, 1947, be determined to be within the scope and claims of the basket patent; (6) for costs of suit; and (7) that the complaint be dismissed.

Although not alleged or otherwise raised in their pleadings or during the trial, plaintiffs in their brief contend that the five attachment licenses in suit are illegal and void because of the price-fixing provisions of section 24 thereof. As this contention was raised long subsequent to the trial, it was stipulated that certain letters passing between the parties relative to canceling said section 24 be admitted in evidence. These letters were as follows: On February 1, 1945, defendant Advancement Corporation (formerly Straight Side Basket Corporation) wrote plaintiffs:

"Whereas, The Straight Side Basket Corporation, a Michigan corporation, of Benton Harbor, Michigan, herein referred to as Licensor, heretofore executed with you as Licensee, the following license agreements dated:

"Attachment #140—April 1, 1930
141—April 1, 1930
142—April 1, 1930
160—April 1, 1930
161—April 1, 1930

and, Whereas, Section numbered 24 of each of said license agreements provides:

" '(24) Licensee agrees not to give away any of these baskets made under this license, except as samples; nor to sell any such baskets for less than the fair market price thereof, and on such terms and conditions as Licensor may, from time to time, decide are just and equitable.

" 'It is further agreed that if the Licensee shall sell any baskets produced under this license for less than the fair market price thereof, then and in each such instance, the Licensor shall be entitled to collect from the Licensee, as liquidated damages, 25 per cent of the fair market price of any such baskets so sold, and the Licensee hereby agrees to pay to the Licensor such liquidated damages upon the demand of the Licensor.'

"And Whereas, Attempts of this Licensor at times before 1940 to exercise the right so reserved to it were unsatisfactory,

"Therefore, Under date of July 19, 1940, Licensor served on all its licensees, including you, the following notice:

" 'No. 124

" 'Date: July 19, 1940

" '*Withdrawal of Fair Market Prices*

" 'In order to enable our licensees to function under their license agreements with us, and yet meet competitive prices made upon other baskets, we hereby withdraw all fair market prices, terms and conditions established by us relative to the sale of baskets manufactured under any license agreement with us.

" 'In many cases our own licensees have, by their manufacture and sale of other baskets at prices representing a loss, compelled this action on our part.'

"And Whereas, Licensor is advised some of its licensees did not understand this notice was a final determination by Licensor,

"Therefore, Licensor notifies you that said notice of July 19, 1940, was and is final and Licensor has not since then and will not hereafter exercise such reserved right *and said section 24 is withdrawn and stricken from the said license agreements.*"

On August 8, 1945, plaintiffs replied to the above letter as follows:

"This acknowledges receipt by the undersigned of your communication dated Feb. 1, 1945, advising us of the elimination of section 24 from our license agreements with you, *to which we consent,* it being our understanding that any and all power of the Licensor to name the sales price of baskets or the terms or conditions of such sales is eliminated and stricken from all license agreements existing between us. * * *

"Walter Verhalen Co. (Licensee) by Walter Verhalen."

From these letters it appears that on July 19, 1940, Advancement Corporation as licensor, in effect had withdrawn and canceled all price-fixing provisions of the attachment licenses. In its letter of February 1, 1945, it advised plaintiffs that the July 19, 1940, notice had been given effect and that section 24 of the attachment licenses relating to price fixing was withdrawn and stricken. In their reply plaintiffs consented and acquiesced in striking that section from the licenses. The court therefore concludes that section 24 of the attachment licenses, relating to price fixing, was lawfully canceled by mutual agreement of the parties and that otherwise the five attachment licenses were legal and continued in full force and effect.

Plaintiffs next contend—in their briefs but not in their pleadings or during the trial—that defendant St. Joe Machines as owner of the Schmidtke basket patent, never transferred licensing rights under that patent to defendant Advancement Corporation and, therefore, that Advancement could not grant manufacturing rights to plaintiffs. It should be noted that in their complaint plaintiffs alleged that prior to April 1, 1930, St. Joe Machines had granted Advancement Corporation licensing rights under the application for the basket patent, and under that patent when issued; and that in their answer defendants admitted the truth of this allegation. In considering plaintiffs' contention it must be kept in mind that, as required by the patent office, Schmidtke had filed divisional applications for the machine and basket patents. On June 15, 1929, while these applications were copending, St. Joe Machines, the Saranac Machine Company, and Advancement Corporation entered into a triparty agreement, by which it was clearly intended that Advancement Corporation should have the exclusive right to grant licenses for the use of machine attachments and for the manufacture of baskets covered by patents and patent applications then or thereafter owned by St. Joe Machines and the Saranac Company. This agreement expressly referred to applications for patents, and the application for the basket patent was then pending. The agreement provided in part:

"Whereas, The parties hereto deem it mutually advantageous to coordinate their efforts in the development of the manufacture and sale of said baskets and other straight-side bushel containers;

"Now therefore, The general undertaking intended and embodied herein among the parties hereto is to encourage and develop the manufacture and sale of said (straight-side, three-hoop) baskets and other straight-side bushel containers generally throughout the United States of America and Canada, *especially by giving to said Licensees (basket manufacturers) proper licenses therefor,* and to furnish Licensees machinery especially fitted for such manufacturing, and each party hereto agrees to perform diligently its part of such general undertaking as herein expressed."

In 1930 and thereafter defendant Advancement Corporation as licensor granted manufacturing rights to plaintiffs and about 50 other basket manufacturers, and no question was ever raised as to its right to grant such licenses. In fact, attachment licenses similar to those involved in the present case, were considered by the courts and recognized as valid in three cas-

es in which Advancement Corporation as licensor claimed infringement of both the machine and basket patents. See Straight Side Basket Corp. v. Zapf Fruit Package Co., D.C., 26 F.Supp. 90, affirmed 6 Cir., 99 F.2d 1015; Straight Side Basket Corp. v. Kull, D.C., 24 F.Supp. 771; and Straight Side Basket Corp. v. Marshall Mfg. Co., D.C.E.D. Texas, decided March 4, 1940 (not reported).[1]

St. Joe Machines admits that Advancement Corporation had the sole licensing rights under the machine and basket patents in suit. Plaintiffs had operated as licensees of Advancement Corporation under the five attachment licenses for over 17 years, and their present collateral attack upon the 1929 agreement and arrangement between St. Joe Machines and Advancement Corporation is without foundation in fact or law. The court concludes that Advancement Corporation did acquire and have sole licensing rights under both the machine and basket patents and that the five attachment licenses here in suit are legal and binding.

The next question to be determined is whether these five attachment licenses terminated on the expiration of the machine patent on April 1, 1947, or continued in force and effect during the life of the basket patent, which expired January 31, 1950. That must be determined from an examination of the terms of the licenses, the supplemental agreement of 1940, and from the acts and dealings of the parties. If the basket patent was within the terms and scope of the attachment licenses, then those licenses would continue in force during the life of that patent.

The five licenses as amended by the addition of new sections 25, 26, 27, and 28, were substantially identical, and a copy of the license relating to machine attachment No. 140 is set forth in appendix A. The testimony reasonably establishes that at the meeting of basket manufacturers in Cincinnati in April, 1930, it was agreed that the first paragraph of section 15 of the printed form of license submitted by Advancement Corporation be canceled and

new section 25 substituted therefor, so that the license would include patents thereafter issued relating to baskets. New section 25 provides: "Licensee admits the validity for the full terms expressed in the grants thereof of all the patents, respectively, covered by this license, *and it is understood that this agreement also covers patents hereafter issued to Licensor, on the subject matter of these patents.*" As patents thereafter issued on the subject matter of baskets would not be issued in the name of Advancement Corporation, it is clear that the above phrase, "patents hereafter issued to Licensor," was intended to include patents on which Advancement held the licensing rights. Section 1 of the licenses provides: "It is expressly agreed and understood that this agreement refers to Straight Side Broken and/or Bent Bottom Baskets and the attachment and parts thereof, manufactured and furnished hereunder for the manufacture of said baskets." Under section 25 quoted above, the licenses covered patents thereafter issued to licensor "on the subject matter of these patents," and from section 1 and other provisions of the licenses, and the supplemental agreement of 1940, it is clear that baskets were the "subject matter" of the patents referred to. The basket patent, when issued January 31, 1933, was on the "subject matter" of baskets and, therefore, was included within the terms and scope of the attachment licenses. It is significant that new section 25 covered "patents" thereafter issued and that the word "patents" was used throughout the license agreements. The attachment licenses were clearly intended to cover patents thereafter issued on the subject matter of baskets as well as the patents and the patent application listed by serial number at the end of the licenses.

In further considering the question as to whether the basket patent was included in the attachment licenses, it should be noted that immediately following the issuance of the basket patent on January 31, 1933, defendant Advancement Corporation sent plaintiffs and other patent licensees its

---

1. A copy of this opinion was attached as an appendix to defendants' main brief.
   No opinion for publication.

bulletin No. 76 dated February 3, 1933, reading as follows:

"As a licensee, you will be interested in knowing about the grant on January 31, 1933, of Schmidtke patent No. 1,895,586 (basket patent). This patent, covering a multi-hoop, continuous stave basket, is exclusively controlled by our company and these additional rights accrue to you through our license agreement.

"Of course, a licensee who uses our patented processes and devices, regardless of what type of basket is made thereon, is required to report and pay the regular license fee. Therefore, the sales of all multi-hoop continuous stave baskets with construction coming within the scope of this basket patent shall hereafter be reported monthly by licensee."

Plaintiffs admit receiving this bulletin and made no objection to the notice and demands of defendant therein set forth, and they thereafter continued for many years to manufacture baskets which came within claim 2 of the basket patent, and to pay royalties thereon as provided in the attachment licenses. On December 8, 1933, defendant Advancement Corporation sent plaintiffs and other patent licensees its bulletin No. 90 advising that under section 5 of the attachment licenses all continuous-stave, straight-side baskets manufactured under the license should be stamped with the machine patent number, 1,752,856, and the basket patent number, 1,895,586. It is significant that after receiving this bulletin, plaintiffs wrote Advancement Corporation on January 2, 1934, requesting that it furnish dies for stamping the patent serial numbers on baskets. On January 24, 1939, Advancement Corporation sent its bulletin No. 110 to plaintiffs and other patent licensees, specifically requesting that they stamp or mark all baskets made under the attachment licenses with the serial number of the basket patent. The fact that plaintiffs continued to pay royalties on baskets they manufactured, for many years after receiving defendant's bulletin No. 76, and that in response to bulletin No. 90 they requested dies to stamp the patent serial numbers on baskets, is indicative of their acquiescence in the inclusion of the basket

patent within the terms and scope of the attachment licenses. The fact that plaintiffs may have breached section 5 of the attachment licenses by not stamping the patent serial numbers on baskets they manufactured, is no defense to defendants' contention that the basket patent was within the scope of the licenses. In paragraph 2 of the 1940 supplemental agreement (see appendix B), plaintiffs expressly agreed that all baskets of the kind described would be covered by the attachment licenses and that they would pay the specified royalties thereon. This agreement, which described baskets of a design clearly within claim 2 of the basket patent, hereinafter quoted, is further indicative of plaintiffs' acquiescence in the inclusion of the basket patent within the terms and scope of the attachment licenses. The licenses granted plaintiffs the right to manufacture baskets under the machine patent and to use certain machine attachments. After granting the licenses, defendant Advancement Corporation obtained a patent on the basket, and if the basket patent was not included within the scope of the licenses, there might be serious question as to whether plaintiffs could manufacture baskets after the expiration of the machine patent without infringing the basket patent. Under the following authorities it could be argued with considerable force that the basket patent was included in the attachment licenses by implication and operation of law and that, after the expiration of the machine patent, plaintiffs were obligated to pay the specified royalties on all baskets covered by the claims of the basket patent. See National Rubber Machinery Co. v. McNeil Machine & Engineering Co., 6 Cir., 132 F.2d 436; Frederick B. Stevens, Inc., v. Steel & Tubes, Inc., 6 Cir., 114 F.2d 815; Victory Bottle Capping Mach. Co. v. O. & J. Mach. Co., 1 Cir., 280 F. 753; Willcox & Gibbs Sewing-Mach. Co. v. Sherborne, 3 Cir., 109 F. 319, certiorari denied, Wilcox & Gibbs Sewing Machine Co. v. Sherborne, 183 U. S. 696, 22 S.Ct. 933, 46 L.Ed. 394; Scovill Mfg. Co. v. Radio Corporation of America, D.C., 9 F.Supp. 239.

Furthermore, in Straight Side Basket Corp. v. Kull, supra, 24 F.Supp. 771, and

Straight Side Basket Corp. v. Marshall Mfg. Co., supra, D.C.E.D.Texas, the courts held that the defendants, as licensees under attachment licenses similar to those involved in the present suit, were estopped from denying the validity of the basket patent. Those holdings that the licensees were so estopped were clearly premised on the courts' conclusion that the basket patent was within the scope of the attachment licenses. Section 18 of the attachment licenses provided that they should terminate "at the expiration of the longest lived patent now or hereafter covering the said attachment, methods, or processes licensed hereunder." As the basket patent was included in the licenses, it was the "longest lived patent" under section 18 thereof.

■ For the many reasons stated, this court holds that the basket patent is included within the terms and scope of the five attachment licenses dated April 1, 1930, and that the licenses continued in force and effect until the expiration of the basket patent on January 31, 1950.

Having concluded that the basket patent is within the scope of the attachment licenses, the plaintiffs are then in the position of licensees under that patent. However, they contend that the patent is invalid, and that immediately raises the question as to whether they, as licensees, can deny its validity. Section 25 of the licenses provides: "Licensee admits the validity * * * of all the patents, respectively, covered by this license," and the second and third paragraphs (not canceled) of section 15 provide:

"Licensee agrees that it will not at any time hereafter, directly or indirectly infringe such patents, nor dispute, nor contest the validity of any such patents, or the novelty or utility or patentability of any subject matter of any such patents, or the title thereto of Licensor, nor directly or indirectly assist any other person contesting the same, and that such patents shall throughout their respective terms, and for all purposes be deemed to be in force and valid.

"Licensee agrees that the expiration of this license or its termination shall not in any way affect the operation of this section nor release nor discharge Licensee from his obligations or his admissions or estoppels herein contained."

■ The precise question as to whether or not licensees of Advancement Corporation under the same form of attachment license as that involved in the present case, could contest the validity of the machine and basket patents was considered and determined in the Kull and Marshall cases (both supra). In each of those cases the court held that the licensee was estopped to deny the validity of both the basket and machine patents.[2] In section 25 of the attachment licenses as amended, plaintiffs admitted the validity of all patents covered by the licenses and in section 15 agreed not to dispute or contest their validity. This agreement was valid and binding on plaintiffs, and as they are licensees under the basket patent, it is clear that they are estopped from denying its validity. In Eskimo Pie Corporation v. National Ice Cream Co., 6 Cir., 26 F.2d 901, 902, the court said: "There is no occasion to doubt that a licensee may lawfully agree not to contest the patent at any time during its term, or that, even after such a license had been terminated by the licensor for the licensee's default, the rights which the licensee had acquired by the contract would have been a valid consideration for this unlimited agreement not to contest."

In Steiner Sales Co. v. Schwartz Sales Co., 10 Cir., 98 F.2d 999, 1009, the court said:

"A licensee while exercising under the protection of the patent the rights conferred by his license is estopped to deny the validity of the patent. * * *

"It has been uniformly held that a licensee may lawfully agree not to contest the validity of a patent at any time during its term."

See also Stubnitz-Greene Spring Corp. v. Fort Pitt Bedding Co., 6 Cir., 110 F.2d

---

2. In Straight Side Basket Corp. v. Zapf Fruit Package Co., supra, 26 F.Supp. 90, holding claim 2 of the basket patent valid, the defendant was not a licensee and, therefore, was not estopped to question the validity of the patent.

126

192; United Lens Corp. v. Doray Lamp Co., 7 Cir., 93 F.2d 969; Midland Steel Products Co. v. Clark Equipment Co., D.C., 75 F.Supp. 143, affirmed 6 Cir., 174 F.2d 541.

For the reasons stated, the court concludes that in the present case plaintiffs are estopped from denying or contesting the validity of the basket patent. However, as defendants in their counterclaim ask that the patent be adjudged valid, the court will consider and determine the question of its validity. It should first be noted that claim 2 was considered and held valid in the three Straight Side Basket cases hereinbefore cited.[3] In the Zapf case, after consideration of the prior art and substantially the same evidence as that presented in the instant case, the court said, 26 F.Supp. at pages 92 and 93:

"Considering first, the validity of claim 2 of the product (basket) patent 1,895,586, the conclusion of the court is that the presumption of validity which attends the granting of the claim and the wide degree of commercial acceptance of the basket entitle plaintiffs to a decree finding claim 2 valid, but with a narrowly confined scope in view of the prior art. A large number of prior art patents are cited in the answer. * * * None of the other basket patents cited seeks or presents a solution of the problem undertaken by Schmidtke in attempting to produce a light, economical and strong basket for shipment and storage to meet modern developments.

"Defendant's attempted defense of prior use is unsatisfactory and unconvincing."

In holding claim 2 of the basket patent valid in the Kull case, the court said, 24 F. Supp. at page 775: "The defendants presented numerous prior art patents but they are lacking in certain elements called for in the claims of the Schmidtke (basket) patent and do not teach the Schmidtke invention. There were no prior continuous stave baskets or basket machines or method which tend to limit the scope of the Schmidtke claims as the so called three

hoop round bottom basket followed the Schmidtke invention. The evidence discloses that the early British or Pratt basket does not establish an anticipation of the Schmidtke patents, nor is there any evidence of any prior basket, basket machine or method, which would limit the scope of the Schmidtke claims."

▮▮ The basket patent is presumed to be valid. Crosley Corporation v. Westinghouse Electric & Mfg. Co., 3 Cir., 152 F.2d 895; Babson Bros. Co. v. Perfection Mfg. Corporation, D.C., 86 F.Supp. 754; Mueller v. Campbell, D.C., 68 F.Supp. 464, affirmed 6 Cir., 159 F.2d 803; Reynolds v. Emaus, D.C., 87 F.Supp. 451. See 2 Walker on Patents, Deller's Ed., pp. 1272, 1273, § 276. The divisional applications for the machine and basket patents were both involved in interference proceedings, and the file wrappers indicate that the pertinent prior-art patents were considered by the patent office. After examination of all the evidence, including that relating to printed publications prior to the application for the basket patent and that relating to a type of basket made by one Pratt in Scotland, the court concludes that the basket patent is valid.

▮ Plaintiffs' charge that the basket patent was "fraudulently and surreptitiously procured" is not supported by the evidence and is without merit. Their contentions that the basket patent constitutes double patenting and that to hold such patent within the scope of the attachment licenses would constitute an undue extension of the monopoly of the machine patent, are likewise without merit. The divisional applications for the machine and basket patents were copending in the patent office. The machine patent described the method and apparatus for making a basket, and the basket patent described the construction of a basket. The claims of the machine patent are not coextensive with the claims of the basket patent and do not teach or disclose all that is found in the latter patent. In other words, the basket patent repre-

---

3. Straight Side Basket Corp. v. Zapf Fruit Package Co., supra, 26 F.Supp. 90, affirmed 6 Cir., 99 F.2d 1015; Straight Side Basket Corp. v. Kull, supra, 24 F. Supp. 771; Straight Side Basket Corp. v. Marshall Mfg. Co., supra, D.C.E.D.Texas.

sents a distinct, different, and separable invention from that of the prior machine patent. The fact that defendant St. Joe Machines is the assignee and owner of both patents, and that defendant Advancement Corporation holds licensing rights under both patents, does not affect the validity of the patents or of the attachment licenses. Study of the two patents in suit and the evidence presented indicates that under the claims of the machine patent, the attachments referred to in the attachment licenses could be utilized to make a basket different from that claimed in the basket patent—in fact, plaintiffs contend that the baskets they manufactured subsequent to April 1, 1947, with the machine attachments referred to in the licenses, or replacements thereof, were different and not within the claims of the basket patent. Furthermore, the basket described in the patent could be made manually or by machines and methods other than those disclosed in the machine patent. The questions of undue extension of patent monopoly through the issuance of a later patent, and of double patenting, were fully considered and determined in this circuit, adversely to the contentions of the present plaintiffs in the case of Wirebounds Patents Co. v. Saranac Automatic Mach. Corp., 6 Cir., 37 F.2d 830.[4] See also Remington Rand Business Service, Inc., v. Acme Card System Co., 4 Cir., 71 F.2d 628; Montgomery Ward & Co. v. Gibbs, 4 Cir., 27 F.2d 466; Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co., 2 Cir., 22 F.2d 259; Thomson-Houston Electric Co. v. Ohio Brass Co., 6 Cir., 80 F. 712.

For the reasons stated, the court concludes that the basket patent was not fraudulently procured; that it does not constitute double patenting; and that it does not create an undue extension of patent monopoly.

Having concluded that the basket patent is within the terms and scope of the attachment licenses, and that the licenses continued in effect until the expiration of said patent on January 31, 1950, the remaining question is whether or not baskets manufactured by plaintiffs subsequent to the expiration of the machine patent on April 1, 1947, are covered by the claims of the basket patent. From examination of the plaintiffs' baskets put in evidence, it is apparent that they are not within claim 1, which provides for the lowermost hoop "being attached to the staves above their bends and extending below the staves to take the weight and wear off of the bends and deliver it to the staves above." However, defendants contend the plaintiffs' baskets are within claim 2 of the patent, which provides: "A container formed out of a plurality of veneer strips each comprising a bottom member and an integral pair of staves, each stave being bent up angularly to the bottom member, all of the bottom members crossing each other, and a plurality of spaced hoops secured to the outer sides of the staves *one of said hoops being located adjacent the ends of the bottom members,* said bottom members being bowed inwardly of the container and held from straightening out by the latter hoop."

It is admitted that the baskets manufactured by plaintiff Hope Company subsequent to the expiration of the machine patent on April 1, 1947, were substantially the same as those manufactured by it prior to that date and during the entire life of that patent. Claim 2 of the basket patent describes the lowermost hoop as being located "adjacent the ends of the bottom members." The principal function of this lowermost hoop is to maintain and hold the inward arch or bulge in the bottom of the basket and to counteract or prevent the tendency of the arched staves to flatten out to their normally flat condition. The evidence indicates that if the lower edge of the lowermost hoop of the basket is at or below the plane of the upper surface of the

4. In reversing the court of appeals upon other grounds, the Supreme Court stated in Saranac Automatic Machine Corp. v. Wirebounds Patents Co., 282 U.S. 704, 715, 51 S.Ct. 232, 236, 75 L.Ed. 634: "The question * * * is not one of reliance upon the prior art of the reissue patent as against a co-pending patent, or of double patenting, or of the overlapping of specific and generic patents."

uppermost one of the crossed staves at the point in the inward arch of the bottom where the staves cross one another, then this hoop will perform its intended function of maintaining the bottom of the basket in its arched condition. A number of baskets manufactured by plaintiff Hope Company were put in evidence, and from measurements it appeared that the distance from the floor line of the bottom of the basket to the lower edge of the lowermost hoop was from a minimum of $\frac{1}{8}$ inch to a maximum of $\frac{7}{16}$ inch. The thickness of the bottom of the baskets at the middle of the inward arch where the staves cross one another was approximately one inch. The question is, was this lowermost hoop on plaintiffs' baskets located "adjacent the ends of the bottom members" of the baskets as provided in claim 2 of the basket patent? Study of the file wrapper indicates that the patent office and the board of appeals in the interference proceedings considered the lowermost hoop as located "adjacent the ends of the bottom members" of the basket when it was so located that it maintained the inward arch or bulge in the bottom. In its decision affirming the examiner the board of appeals said in part: "If there is anything patentable it must lie in the function of the hoop in supporting the bottom in its bulged form against the tension in the strips tending to flatten out." In considering the word "adjacent" in claim 2 of the basket patent the court said in Straight Side Basket Corp. v. Zapf Fruit Package Co., supra, 26 F.Supp. at page 94: "A holding that the word 'adjacent' as used in claim 2 refers to a hoop so close to the edge that it performs the various functions recited in the specifications, is unavoidable when the word is construed in the light of the specifications." It should be noted that in the Zapf case the baskets held not to infringe claim 2 of the basket patent were substantially different from the plaintiffs' baskets in the present case; that is, the lowermost hoop of the Zapf baskets did not hold the bottom in arched or concave form, while the lowermost hoop of plaintiffs' baskets does hold and maintain the inward arch in the bottom.

In Straight Side Basket Corp. v. Kull, supra, the plaintiff claimed that baskets manufactured by the defendant, in which the bottom hoop was raised a distance of approximately $\frac{1}{4}$ to $\frac{3}{8}$ inch from the floor line, infringed claim 2 of the basket patent. In holding claim 2 of the patent valid and that the defendant's baskets infringed, the court said, 24 F.Supp. at pages 773 and 774:

"The invention set forth in claim 2 comprehends the location of the lower third hoop adjacent the ends of the bottom members and near the bottom of the side walls and the essential element of the claim is reinforcing hoop adjacent and close enough to the ends of the bottom members to maintain their generally inwardly arched configuration. * * *. The location of the third hoop adjacent to the bottom serves to assist in maintaining the arch of the basket bottom. * * * There is no difference in the function of the hoop at the bottom. The arch in defendants' basket is sufficient to strengthen the basket and achieve the objects of the invention. * * *

"The two baskets are substantially identical and the slight change in the form of the Kull basket is merely a colorable departure from the Schmidtke basket. There appears a substantial identity. It is immaterial under the law on which parts of the combination the hoops or other parts in controversy are located so long as they function alike in both structures and the same results are obtained." ·

Under claim 2 of the basket patent the lowermost hoop is located "adjacent the ends of the bottom members" when it is so located that it holds and maintains the inward arch or bulge in the bottom of the basket. Therefore, from examination of the testimony and the baskets put in evidence, the court concludes that the lowermost hoop on plaintiffs' baskets is located "adjacent the ends of the bottom members", as provided in claim 2 of the basket patent. It is significant that in the supplemental agreement of 1940 (appendix B) the plaintiffs agreed to pay royalties on a type or design of basket that was clearly within claim 2 of the basket patent. It is also significant that subsequent to April 1, 1947, and at the

time of trial, plaintiff Hope Company was using replacements of the same machine attachments that it had used during the life of the machine patent, and that it was making substantially the same basket that it had made during the life of that patent.

In summary, the court concludes that all baskets similar to those put in evidence, manufactured by plaintiffs after the expiration of the machine patent on April 1, 1947, are within claim 2 of the basket patent, and that under the attachment licenses the plaintiffs are obligated to pay royalties thereon during the life of the basket patent. Having concluded that the attachment licenses continued in force until the expiration of the basket patent on January 31, 1950, the plaintiffs are not entitled to recover the royalties paid defendant Advancement Corporation after the expiration of the machine patent on April 1, 1930, in the amount of $2,800.49.

The court has carefully examined and considered the evidence relative to the defendants' counterclaim for damages by reason of the plaintiffs' alleged activities and wrongdoings in persuading, inducing, and coercing other patent licensees of defendant Advancement Corporation to cease paying royalties and to contribute to a fund to be used in connection with the prosecution of the present suit. This is obviously a test case, prosecuted by plaintiffs on behalf of themselves and other licensees of Advancement Corporation. The court is not convinced that they were acting in bad faith or that they were guilty of harassing or vexatious tactics in financing and prosecuting this suit to obtain a judicial determination as to whether their liability under attachment licenses terminated at the expiration of the machine patent on April 1, 1947, or at the expiration of the basket patent on January 31, 1950. After consideration of the evidence presented, the court concludes that defendants have failed to sustain their counterclaim for damages and for the costs of this suit.

In view of the court's conclusions as set forth in this opinion, other questions presented do not require consideration or determination. A decree will be entered in accordance with this opinion.

## Findings of Fact

1. The original patent application by Albert H. Schmidtke entitled "Basket and Method and Apparatus for Making Same" was filed in the patent office March 25, 1926. The patent office required a division of the application between the method-and-apparatus claims and the basket claims, and a divisonal application on the basket claims was filed and was copending with the said original patent application. These patent applications were assigned to defendant St. Joe Machines.

2. Schmidtke method-and-apparatus (machine) patent No. 1,752,856 was issued April 1, 1930, and Schmidtke basket patent No. 1,895,586 was issued January 31, 1933; defendant St. Joe Machines is the owner of these patents.

3. Defendant St. Joe Machines granted Advancement Corporation exclusive licensing rights under the Schmidtke patent applications and under both the Schmidtke machine patent and basket patent.

4. The parties mutually agreed to cancel section 24 of the attachment licenses, which related to price fixing.

5. At the meeting of representatives of defendant Advancement Corporation and basket manufacturers held in Cincinnati April 10, and 11, 1930, at which plaintiff Walter Verhalen was present, it was agreed that the printed form of attachment license submitted by Advancement should be amended and changed by canceling the first paragraph of section 15 and substituting new section 25 therefor, and by adding new sections 26, 27, and 28. By canceling the first paragraph of section 15 and substituting new section 25, the basket manufacturers and Advancement Corporation intended the attachment license to cover and include patents relating to baskets, thereafter issued, on which Advancement held licensing rights.

6. The plaintiffs executed the five attachment licenses dated April 1, 1930, and in 1940 executed a supplemental agreement (appendix B), which described the type or design of basket on which plaintiffs would thereafter pay royalties under the attachment licenses. The baskets described in this supplemental agreement were within the scope of claim 2 of the basket patent in suit.

7. Plaintiffs manufactured baskets under the five attachment licenses and the supplemental agreement, and used the machine attachments referred to in the licenses, or replacements thereof, and paid the specified royalties to defendant Advancement Corporation until the machine patent expired April 1, 1947, and for several months thereafter during the life of the basket patent. Subsequent to the expiration of the machine patent the plaintiffs used the same machine attachments, or replacements thereof, that they had used during the life of the machine patent and manufactured substantially the same basket that they had made during the life of that patent.

8. The baskets put in evidence, which were manufactured by plaintiffs subsequent to the expiration of the machine patent, were within claim 2 of the basket patent.

9. The parties intended to include the basket patent in the five attachment licenses.

10. The basket patent represents a distinct, different, and separate invention from that of the machine patent.

11. The basket patent was not "fraudulently and surreptitiously" procured, as alleged by plaintiffs. Said patent does not constitute double patenting and does not create an undue extension of the machine patent monopoly.

12. The Schmidtke basket patent No. 1,-895,586 is valid.

13. Subsequent to the expiration of the machine patent on April 1, 1947, and during the life of the basket patent, plaintiffs voluntarily paid defendant Advancement Corporation the royalties specified in the five attachment licenses in the aggregate amount of $2,800.49.

## Conclusions of Law

1. This court has jurisdiction of the parties and the subject matter of this suit.

2. Defendant St. Joe Machines is the assignee and owner of Schmidtke machine patent No. 1,752,856 and Schmidtke basket patent No. 1,895,586.

3. Defendant St. Joe Machines granted exclusive licensing rights under the Schmidtke patent applications and under the Schmidtke machine and basket patents to defendant Advancement Corporation.

4. Section 24 of the attachment licenses, relating to price fixing, was lawfully canceled by mutual agreement of the parties.

5. The Schmidtke basket patent is included within the terms and scope of the five attachment licenses in suit.

6. The five attachment licenses did not terminate upon the expiration of the machine patent on April 1, 1947.

7. The attachment licenses are valid and continued in force and effect until the expiration of the basket patent on January 31, 1950.

8. As the basket patent is included within the attachment licenses, the plaintiffs are licensees under that patent.

9. The plaintiffs as licensees under the basket patent are estopped to deny its validity.

10. The Schmidtke basket patent No. 1,895,586 is valid.

11. The plaintiffs are obligated under the five attachment licenses to pay the specified royalties on all baskets within claim 2 of the basket patent, manufactured and sold by them during the life of said patent.

12. The baskets manufactured by plaintiff subsequent to April 1, 1947, and presented in evidence, are within the scope of claim 2 of the basket patent.

13. Plaintiffs are not entitled to recover royalties which they paid defendant Advancement Corporation subsequent to April 1, 1947, in the amount of $2,800.49.

14. Defendants are not entitled to recover damages by reason of plaintiffs' acts and doings in connection with the promotion, financing, and prosecution of this suit.

15. Defendants are not entitled to the injunctive relief prayed for and are not entitled to the costs of suit.

16. Defendants are entitled to a decree dismissing plaintiffs' complaint.

17. Defendants are entitled to recover court costs.

Appendix A

## The Straight Side Basket Corporation
### Benton Harbor, Michigan

### Attachment License

This agreement made this first day of April, 1930, by and between The Straight Side Basket Corporation, organized and existing under the laws of the State of Michigan, with headquarters at Benton Harbor, Michigan, hereinafter referred to as "Licensor," and Hope Basket Company of Hope, Arkansas, and/or Walter Verhalen Co., of Dallas, Texas, hereinafter referred to as "Licensee," Witnesseth.

In connection with the manufacture of "Straight Side Broken and/or Bent Bottom Baskets" Licensor has sole rights to patents and applications for patents covering patented methods, processes, machines and machine attachments; also, said Licensor has exclusive right to license and lease said attachments used in the manufacture of said Straight Side Broken and/or Bent Bottom Baskets.

Licensee desires to engage in the business of manufacturing and selling said Straight Side Broken and/or Bent Bottom Baskets at the location hereinafter described: [Hope, Arkansas].

Now, Therefore, it is agreed by and between Licensor and Licensee as follows, to-wit:

(1) It is expressly agreed and understood that this agreement refers to Straight Side Broken and/or Bent Bottom Baskets and the attachment and parts thereof, manufactured and furnished hereunder for the manufacture of said baskets.

(2) It is understood and agreed that said Licensee is now in possession of an attachment for making baskets of the kind specified above, which attachment was manufactured by, or for Hope Basket Co. of Hope, Arkansas, and it is hereby understood and agreed that in consideration of the benefits hereunder accruing to Licensee and as part of the consideration of this agreement, said attachment hereby becomes the property of said Licensor and it is agreed that said Licensee shall continue to have the use of said attachment hereafter known as Straight Side Broken and/or Bent Bottom Basket Machine Attachment No. 140 upon the terms and conditions as specified in this agreement.

(3) Licensee agrees to pay for use of said attachment and the privilege of manufacturing said Straight Side Broken and/or Bent Bottom Baskets on said attachment, in addition to the consideration paid or to be paid by Licensee for the initial right to obtain the attachment leased hereunder, sums of money equal to the sums herein specified in subdivision "A" or "B" as Licensor may, from time to time, on ninety days' notice to Licensee, elect:—

(A) Sums of money equal to two and one-half percent of the gross sales (as hereinafter defined) of all baskets produced under this license; such sums to be payable on or before the fifteenth day of each calendar month upon all baskets shipped during the preceding calendar month. Licensee shall report in writing to Licensor at the end of each calendar month, the amount of gross sales and the number of said baskets shipped during said month.

(B) Sums of money equal to five cents per dozen for all baskets sold under this license; such sums to be payable on or before the fifteenth day of each calendar month upon all baskets delivered during the preceding calendar month. Licensee shall report in writing to Licensor at the end of each calendar month, the number of baskets delivered during said month.

Licensee agrees to pay such sums as a license fee for the use of said attachment hereunder licensed to be used, and/or for the continuing right to use said attachment leased hereunder.

"Gross Sales" wherever used in this license shall mean the amounts of the delivered prices of said baskets complete; including in such amounts the amounts of the transportation charges on such baskets from Licensee's factory to the point at which such baskets are to be used, whether such baskets shall have been sold f. o. b. plant of Licensee or f. o. b. plant of Licensee's customer, but excluding from such amounts, such discounts or allowances

(except transportation charges above mentioned) as are made in good faith.

(4) Licensee agrees to keep accurate records of all business carried on hereunder and Licensor, or his agents, shall have the right to examine said records and make copies or abstracts thereof, and shall have the right of inspecting said attachment and said baskets at any time during regular business hours.

(5) Licensee agrees to stamp or mark all baskets made, as directed by Licensor, from time to time; also agrees to affix any plates or inscriptions furnished by Licensor upon said attachment according to Licensor's directions, which plates or inscriptions shall not be removed or defaced, and if so removed or defaced, shall be restored forthwith by Licensee.

(6) Licensee agrees to notify Licensor immediately in writing of all claims made and/or suits commenced against Licensee because of his exercising any of the privileges hereby leased to him, and Licensor agrees that he will defend any such suit that may be instituted without Licensee's collusion for the alleged infringement of patents by reason of using said patented attachment and method for manufacturing baskets under the patents covered by this license; provided that Licensee shall have paid all monies due to Licensor and shall have performed all his obligations hereunder, and shall have given Licensor immediate notice in writing, of any threat or institution of such suit and shall have given Licensor all needful information in Licensee's possession to enable and permit Licensor to carry on the defense of such suit and any appeal from the judgment or decree rendered therein; and, upon Licensee fully complying with the foregoing conditions, Licensor agrees to hold and save harmless Licensee from all loss or damage that may be awarded in any such suit. Licensor shall not be responsible for or bound by any compromise made without his written consent.

(7) Licensee shall have no property right in said attachment licensed hereunder but shall have only the right to use the same under conditions of this license.

(8) Licensee cannot sell, encumber, nor allow said attachment to be removed from his possession either upon writ of attachment against it, or in satisfaction of any execution, judgment or decree against him, or any other debt, or otherwise, or on distraint for rent. Licensee agrees not to sublicense nor allow any other person to use the said attachment without consent of Licensor in writing.

(9) If Licensee fails to pay all license fees, rentals, or other charges when same become due and payable, or fails to perform any other obligation herein assumed, Licensor may, on thirty days notice in writing, terminate this lease and license, and Licensee shall have no further right or use hereunder.

(10) If Licensee be adjudged insolvent or bankrupt, or make for the benefit of creditors any bill of sale, deed of trust, or assignment or other like instrument which affects said attachment licensed hereunder, then this license, ipso facto, shall terminate without any notice from Licensor.

(11) Licensee may, by giving thirty days notice in writing, terminate this agreement.

(12) Any default in the performance of any conditions imposed upon Licensor or Licensee may be cured within thirty days after written notice thereof by registered mail has been given to the defaulting party, and upon such default being cured the penalties herein provided for shall be waived as to that particular default.

(13) If this license or agreement be terminated under any provision hereof, Licensee agrees to deliver, prior to final termination of this license, in good working order, ordinary wear and tear excepted, to Licensor, said attachment and parts thereof delivered to Licensee under this license, properly crated for shipment f. o. b. Benton Harbor, Michigan, or any point of destination specified by Licensor provided such charges shall not exceed the established charge for delivery at Benton Harbor, Michigan.

(14) The termination of this license, by Licensee or Licensor, shall not release Licensee from the obligation to pay to Li-

censor all unpaid license fees and all other obligations due prior to such termination, and such termination shall be without prejudice to any right or remedy which Licensor may have for violation of contract, use of said attachment without right, or unlawful use of patented inventions.

In no case shall Licensee have any claims for repayment or offset of any sum or sums which shall have been paid as required under the terms of this license.

(15) Licensee admits the validity for the full terms expressed in the grants thereof of all the patents, respectively, now or hereafter covered by this license. (Cancelled; section 25 substituted, [89 F.Supp. 134]).

Licensee agrees that it will not at any time hereafter, directly or indirectly infringe such patents, nor dispute, nor contest the validity of any such patents, or the novelty or utility or patentability of any subject matter of any such patents, or the title thereto of Licensor, nor directly or indirectly assist any other person contesting the same, and that such patents shall throughout their respective terms, and for all purposes be deemed to be in force and valid.

Licensee agrees that the expiration of this license or its termination shall not in any way affect the operation of this section nor release nor discharge Licensee from his obligations or his admissions or estoppels herein contained.

(16) If Licensee, after the termination of this contract, infringes any patent covered by this license, then in any suit brought against Licensee for infringement of any such patent, the measure of recovery in case of a verdict or decree against Licensee, shall be triple the license fee hereinbefore agreed to be paid by Licensee, which said sum is hereby agreed upon and fixed as liquidated damages.

(17) The words "attachment" or "attachment and parts thereof" used herein shall apply to the attachment and parts originally furnished and to any attachment or parts subsequently furnished.

(18) Unless otherwise terminated by action of the parties hereto or by mutual consent, this contract shall terminate at the expiration of the longest lived patent now or hereafter covering the said attachment, methods, or processes licensed hereunder.

(19) This lease and license agreement, attachment or parts thereof is not transferable except with Licensor's written consent.

(20) Licensee agrees to comply with the written specifications of the standard of manufacture of Straight Side Broken and/or Bent Bottom Baskets, kind of material to be used, and the dimensions of same, including the workmanship on said baskets and the gauge of the wire used; and in the event Licensee willfully violates or does not comply with said standard, Licensor shall have the right to cancel this agreement. It is further agreed if Licensee manufactures said baskets under this license by any other method not approved by Licensor, Licensor shall have the right to cancel this agreement.

(21) A waiver of either party of any default on the part of the other party in any of the conditions of this license shall not be construed as a continuing waiver or a waiver of any other defaults of such party.

(22) It is mutually agreed that there are no verbal promises, agreements, or understandings outside of this contract, and the validity of this agreement shall be determined with reference to the laws of the State of Michigan.

(23) Licensee agrees to hold Licensor harmless from any and all claims for injury and damages to person or property claimed or sustained by any person because of the operation and/or use of any attachment or part hereby leased.

(24) Licensee agrees not to give away any of these baskets made under this license, except as samples; nor to sell any such baskets for less than the fair market price thereof, and on such terms and conditions as Licensor may, from time to time, decide are just and equitable.

It is further agreed that if the Licensee shall sell any baskets produced under this license for less than the fair market price thereof, then and in each such instance, the Licensor shall be entitled to collect from the Licensee, as liquidated damages, 25 per cent of the fair market price of any such

baskets so sold, and the Licensee hereby agrees to pay to the Licensor such liquidated. damages upon demand of the Licensor. This contract cancels and supersedes agreement dated Jan. 7, 1928, between American Containers Corp. and Licensee. (See amendment adding sections 25, 26, 27, and 28. 89 F.Supp. 134.

In Witness Whereof, Licensor. and Licensee have, each respectively, duly executed these presents, in duplicate, at their respective domiciles.

> The Straight Side Basket Corporation (Licensor)
> By W. E. Hatch, Pres.
> Hope Basket Co. (Licensee)
> By Walter Verhalen

(Names of witnesses omitted.)

The above license agreement operates under Letters Patent No. 1,751,728 and No. 1,752,856, and Patent Application. No. 193,449.

---

### Amendment

(25) It is agreed that paragraph 1 of section 15 is canceled and the following is substituted therefor:

Licensee admits the validity for the full terms expressed in the grants thereof of all the patents, respectively, covered by this license, and it is understood that this agreement also covers patents hereafter issued to Licensor, on the subject matter of these patents.

It is agreed the following sections are added viz.:

(26) If the patents be declared invalid by a United States District Court by a decree not appealed from, or by a court of last resort in the circuit in which the Licensee is domiciled and the case be not carried to the Supreme Court of the United States then the title of said "attachment" shall vest in the Licensee and the payment of royalties shall cease.

(27) The Licensor shall use due diligence in prosecuting infringers of these patents: if the patents be declared invalid in any court of last resort in any circuit, unless Licensor institute suit against an infringer in another circuit and carry it to a finality, the Licensor shall be held to be lacking in

due diligence, within the meaning of this clause.

(28) The terms of this contract are binding on the successors, heirs and legal representatives of the parties hereto.

> The Straight Side Basket Corporation (Licensor)
> By W. E. Hatch, Pres.
> Hope Basket Co. (Licensee)
> By Walter Verhalen

(Names of Witnesses omitted.)

### Appendix B

Agreement Supplemental to Each of Five Separate Attachment License Agreements Executed as of April 1, 1930, Between the Straight Side Basket Corporation, a Michigan Corporation, as Licensor, and Hope Basket Company, an Arkansas Corporation of Hope, Arkansas, and/or Walter Verhalen Company, a Copartnership of Dallas, Texas, as Licensees.

---

The Licensor and Licensees agree that each of the above attachment license agreements executed between the parties hereto and dated April 1, 1930, is amended and construed as follows:

(1) In computing "gross sales," under paragraph numbered 3 of said attachment license agreements, the words "baskets complete" mean and include baskets complete with covers.

(2) Licensees acknowledge and agree that the United States patents, the use of which are licensed in the said several attachment license agreements, cover all continuous stave baskets wherein the majority of the basket bottom forming portions of the staves are arched upwardly to any extent whatsoever, and wherein the lower hoop applied while the staves are arched is located with its lower edge no farther from the floor line than the upper surface of the uppermost one of the crossed staves at the point in the basket bottom where the staves cross one another. And Licensees agree that they will regard all baskets of the kind defined above as coming under and being covered by the said "Attachment License" agreements and will pay the speci-

fied royalty thereon. *And Licensees will pay the license fees as provided in said attachment license agreements on all baskets of the above description manufactured by licensees, regardless of the method of manufacture used by licensees in manufacturing the same.*

(3) If, and so long as, Licensor establishes fair market prices, terms and conditions relative to sale of said baskets, Licensees will send to Licensor monthly copies of all invoices of baskets sold during the preceding month by Licensees. And, it is agreed that Licensees will, upon the execution of this Supplemental Agreement, pay Licensor the sum of $371.84 in full compromise and settlement of all claims and demands Licensor has or claims to have against Licensees for violation of said paragraph numbered 24 previous to this date.

(4) Licensor hereby withdraws the notice heretofore given by it to Licensees of Licensor's intention to cancel the said Attachment License agreements.

(5) Except as hereinabove provided, each of said five Attachment License agreements executed by Licensor to Licensees as of April 1, 1930, remain in full force and effect.

> The Straight Side Basket Corp.
> By W. E. Hatch, President
> Hope Basket Co., A Corporation
> By Walter Verhalen, President
> Walter Verhalen Co., A Co-Partnership
> By Walter Verhalen, President

(Names of witnesses omitted)